**Colleen CRANDELL, D.O., Plaintiff,**

v.

**NEW YORK COLLEGE OF OSTEOPATHIC MEDICINE,**
**et ano., Defendants.**

**No. 99 CIV. 2347(LAK).**

United States District Court,
S.D. New York.

March 10, 2000.

Alan Serrins, Dienst & Serrins, LLP, New York, NY, for Plaintiff.

Catherine Murphy, James Ryan, Cullen and Dykman, for Defendants.

## OPINION

KAPLAN, District Judge.

Sexual harassment and other forms of gender discrimination in medicine and medical education are said by some to have restricted the flow of able women into the profession and burdened the training and careers of those who have entered it.[1]

The plaintiff in this case alleges that she was subjected to sexual harassment through much of her training as an osteopathic physician at the New York College of Osteopathic Medicine ("NYCOM") and during her subsequent internship at St. Barnabas Hospital. Most of the alleged conduct of which she complains ranges from tasteless and insensitive to egregious. Rather than suing the individuals responsible, however, she has brought this action against NYCOM and New York Institute of Technology ("NYIT"), of which NYCOM is a branch, under Title IX of the Civil Rights Law of 1964, as amended,[2] and parallel State and City legislation.[3] She thus has illustrated one of the difficulties inherent in this area.

Defendants seek summary judgment dismissing the complaint, essentially on the grounds that plaintiff's allegations, even if true, do not make out a case of sexual harassment and, in any case, that defendants are not liable because plaintiff did not inform them of the events complained of her until after she graduated and finished her internship. The first of their contentions borders on the frivolous. If what plaintiff alleges occurred, a jury quite reasonably could find that she was subjected to sexual harassment. The second argument, however, is far more substantial. Plaintiff's failure to notify defendants of her problems as they occurred, as she now says, may well have been a product of concern about the effect of such complaints on her grades and career prospects. Indeed, the female faculty member to whom she made her sole complaint reportedly told her that women in medicine just have to get used to such things. But the issue is not whether plaintiff's reticence was understandable. Given the Supreme Court's holding in *Gebser v. Lago Vista Independent School District*,[4] that educational institutions may be found liable under Title IX only if an appropriate official at the institution has actual knowl-

---

**1.** *See, e.g.,* FRANCES K. CONELY, WALKING OUT ON THE BOYS (1998); DeWitt C. Baldwin, Jr., Steven R. Daugherty, & Edward J. Eckenfels, *Student Perceptions of Mistreatment and Harassment During Medical School: A Survey of Ten United States Schools,* 155(2) WESTERN J. MED. 140 (1991).

**2.** 20 U.S.C. § 1681 *et seq.*

**3.** N.Y. EXEC. L. § 290 *et seq.* (McKinney 1993); N.Y.C. ADMIN. C. art. 8.

**4.** 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998).

edge of the discrimination, plaintiff's failure to speak up is fatal to the bulk of her claims.

## Facts

As on any summary judgment motion, the Court is obliged to view the evidence in the light most favorable to the plaintiff. Accordingly, defendants quite understandably have not challenged plaintiff's version of the facts on this motion, but have confined themselves to making legal arguments in support of dismissal, even assuming that everything that plaintiff alleges took place. Thus, the facts set forth here reflect simply plaintiff's claims rather than anything established by adjudication.

### Allegations of Harassment

Plaintiff Colleen Crandell entered medical school at NYCOM in the fall of 1994. She graduated in 1998 and subsequently held a one-year paid post-graduate internship at St. Barnabas Hospital from July 1998 to July 1999. All of her claims relate to incidents occurring during this period.[5]

#### 1. Professor No. 1

Just weeks after beginning her studies at NYCOM in the fall of 1994, plaintiff was approached by one of her anatomy professors, Professor No. 1, who asked her out on a date.[6] Although plaintiff declined the invitation, Professor No. 1 was not dis-

suaded and asked her out several more times over the course of the semester.[7] On at least one of these occasions, he told plaintiff that she was pretty.[8] On another, he said that he wanted to break off his relationship with his fiancé in order to date plaintiff.[9] Although Professor No. 1 never explicitly requested sex on any of these occasions, plaintiff assumed from his comments and the frequency of his requests that Professor No. 1 was asking plaintiff to have sex with him.[10] Plaintiff consistently refused his invitations.[11]

On one evening during the semester, Professor No. 1 arrived at plaintiff's apartment with a fellow NYCOM professor, who apparently had dated plaintiff's roommate.[12] The roommate invited Professor No. 1 and his friend in and, sometime thereafter, Professor No. 1 entered plaintiff's bedroom uninvited and kissed plaintiff against her will.[13] Plaintiff pushed him away and told him to leave the room.[14]

After this incident, the requests for dates ceased.[15] Plaintiff nonetheless was frightened of Professor No. 1, felt uncomfortable around him, and tried to avoid him as much as possible.[16] Accordingly, she began to miss her anatomy class.[17]

Plaintiff never reported any of this behavior to NYCOM officials.[18]

---

5. Plaintiff originally brought claims also against St. Barnabas Hospital, but those claims all have been dropped or dismissed. On September 27, 1999, plaintiff moved for leave to amend the complaint to allege a claim under Title IX based on the denial of her application to become a dermatology resident at St. Barnabas. The Court denied this aspect of the motion on the ground that residency positions primarily involve employer-employee relationships and therefore properly are governed by Title VII, rather than Title IX. In consequence, no claims relating to the denial of plaintiff's residency application remain in this case.

6. Crandell Dep. at 50–51 (Pl.Mem.Ex. B).

7. *Id.;* Crandell Aff. ¶ 3, Dec. 13, 1999.

8. Crandell Dep. at 53.

9. *Id.* at 50.

10. *Id.* at 54; Crandell Aff. ¶ 3.

11. Crandell Dep. at 51.

12. *Id.* at 57–58.

13. *Id.* at 60; Crandell Aff. ¶ 3.

14. Crandell Dep. at 61.

15. *Id.* at 64.

16. *Id.* at 55.

17. *Id.*

18. *Id.* at 81.

### 2. *Professor No. 2*

During the same semester, another anatomy professor, Professor No. 2, made several comments with sexual overtones during class.[19] These comments were directed at either plaintiff's large lecture class or her small laboratory section, consisting of about six people, and not at plaintiff personally.[20]

Plaintiff never reported these comments to school officials.[21]

### 3. *The Cardiologist*

During her third year of medical school, plaintiff began to experience heart palpitations.[22] When she visited the NYCOM student medical center for evaluation, the attending physician, Dr. Barbara Capozzi, recommended that plaintiff see a cardiologist and suggested a NYCOM faculty member who had taught plaintiff during her second year (the "Cardiologist").[23] Accordingly, plaintiff made an appointment to see the Cardiologist at his private office on Long Island.[24]

After arriving at the office, plaintiff met briefly with the Cardiologist and then was taken by a female nurse into an examination room and asked to change into a gown.[25] After she changed, the Cardiologist entered the room, asked the female nurse to leave, and began to listen to plaintiff's heart using a stethoscope.[26] During this examination, the Cardiologist pressed his erect penis against plaintiff's hand, which was gripping the side of the table.[27] When she moved her hand forward, he followed and continued to press himself against her.[28] After the examination, plaintiff dressed and was walking down the hallway when the Cardiologist stopped her and told her that she was the most beautiful of all his patients.[29]

Following this visit, plaintiff returned once to the Cardiologist's office for a follow up consultation and later to pick up a heart monitor from the Cardiologist's technician and to return the monitor.[30] During the latter two visits, she did not see the Cardiologist.[31] She did not return to his office, although the heart palpitations continued.[32]

After this incident, plaintiff felt humiliated, violated and fearful that there could be a negative effect on her medical career, given the Cardiologist's prominence at NYCOM and in the broader medical community.[33] In consequence, she did not report this experience to anyone at NYCOM.[34]

### 4. *The Lutheran Hospital Resident*

Beginning in her third year of medical school, plaintiff was sent on a series of clinical clerkship rotations at various area hospitals as part of her medical education. In the fall of her third year, plaintiff was sent on a clinical rotation to Lutheran Hospital, where she was assigned to work with an obstetrics/gynecology resident (the "Resident").[35] During the six week rota-

19. *Id.* at 31; Crandell Aff. ¶ 4.

20. Crandell Dep. at 32; Crandell Aff. ¶ 4.

21. Crandell Dep. at 33.

22. *Id.* at 67.

23. *Id.*

24. *Id.* at 72.

25. *Id.* at 74.

26. *Id.* at 74, 76.

27. *Id.*

28. *Id.*

29. *Id.* at 77.

30. *Id.* at 78–79.

31. *Id.* at 79.

32. *Id.* at 80.

33. *Id.;* Crandell Aff. ¶ 7.

34. Crandell Dep. at 81.

35. *Id.* at 82.

tion, the Resident subjected plaintiff to numerous sexual comments, including routine references to her as his girlfriend, often in front of patients and hospital staff, and remarks about the size of her breasts.[36] He frequently put his arms around her.[37] On one occasion, immediately after commenting that her breasts needed to be "fattened up," the Resident asked plaintiff to lunch and told her that if she refused to spend time and eat lunch with him on a regular basis, he would fail her for the rotation.[38] Given the Resident's prior behavior toward her, plaintiff felt this invitation to be sexual in nature.[39] The Resident subsequently asked her to lunch at least four additional times.[40] Only once did plaintiff have lunch with him in the hospital cafeteria.[41] Although plaintiff refused all other invitations, asked him to stop calling her his girlfriend, and reminded him that she was engaged, the Resident stated that he did not care and continued his behavior.[42]

Near the end of the clinical rotation, before receiving her grade, plaintiff reported the Resident's behavior to Dr. Lisa Eng, an attending physician at Lutheran Hospital who had taught part of plaintiff's ob/gyn course at NYCOM and who was in charge of all medical students on clinical rotations at Lutheran.[43] Although plaintiff told Dr. Eng that she had been sexually harassed by the Resident and discussed some of the specific incidents of harassment, Dr. Eng dismissed plaintiff's complaint, responding that, as a woman in medicine, plaintiff should get used to such behavior.[44] The hospital's director of ob/gyn, Dr. Zarou, was present during this conversation.[45]

After the clinical rotation was finished, plaintiff learned that she had received a poor grade.[46] In consequence, she went to speak to Dr. Abraham Jeger, NYCOM's Associate Dean of Clinical Affairs, whom she had been told to contact in case of any problems with the clinical rotations.[47] She explained to Dr. Jeger that the Lutheran Hospital Resident had sexually harassed her and complained that she had received a poor grade because she had protested to Dr. Eng.[48] She reported to Dr. Jeger some of the specific incidents of harassment by the Resident, but did not talk about previous incidents with Professor No. 1, Professor No. 2, and the Cardiologist because she did not know what effect, if any, her complaint would have on her career and professional reputation.[49] After plaintiff explained her situation, Dr. Jeger responded that he would raise her grade, but did not offer to do anything about the harassment.[50] He did not suggest that plaintiff report the incidents to anyone else at NYCOM.[51]

### 5. The Gastroenterologist

Later during her third year, plaintiff was sent on a clinical rotation to Nassau County Medical Center, where she was assigned to rotate for one month with an attending physician in gastroenterology

**36.** *Id.* at 82–84; Crandell Aff. ¶ 8.

**37.** Crandell Aff. ¶ 8.

**38.** Crandell Dep. at 85.

**39.** *Id.* at 86.

**40.** *Id.* at 88.

**41.** *Id.* at 86.

**42.** *Id.* at 87.

**43.** *Id.* at 90; Crandell Aff. ¶ 12.

**44.** Crandell Dep. at 92.

**45.** *Id.* at 91.

**46.** *Id.* at 94.

**47.** *Id.;* Crandell Aff. ¶¶ 12, 15.

**48.** Crandell Dep. at 94.

**49.** *Id.* at 94–96.

**50.** *Id.* at 94–95; Crandell Aff. ¶¶ 12, 14, 15.

**51.** Crandell Aff. ¶ 15.

(the "Gastroenterologist").[52] During this time, the Gastroenterologist made numerous comments and sexual overtures to plaintiff, including comments about her looks and her weight, suggestions that she was too attractive to be a physician, and appeals to plaintiff to date his sons.[53] Further, he frequently stared at her and put his arms around her shoulders.[54]

In response to the Gastroenterologist's behavior, plaintiff tried to keep her distance from him.[55] Additionally, she told him to stop on more than one occasion,[56] although he merely laughed in response.[57] Plaintiff took no further action because she was intimidated by the Gastroenterologist and feared that he could affect her grade, as he was required to complete her evaluation form.[58] Further, as Dr. Jeger had done nothing to address the sexual harassment she experienced at Lutheran Hospital, she feared that a complaint would be to no avail.[59]

One year later, during her fourth year at NYCOM, plaintiff was assigned to another clinical rotation at the same hospital.[60] Although the rotation involved pulmonary medicine, and plaintiff therefore was not required to work with the Gastroenterologist, she once found herself in the hospital's intensive care unit ("ICU") with the Gastroenterologist and several other attending physicians, residents and students.[61] In front of these observers, the Gastroenterologist began to criticize plaintiff's weight, commented that she must suffer from bulimia, and attempted to pull her hair.[62] In response, plaintiff broke down crying and left the ICU.[63]

### 6. The Surgical Resident

During the final clinical rotation of her third year, plaintiff was sent to Brookdale Hospital, where she was assigned to do rounds with a surgical resident (the "Surgical Resident").[64] During these rounds, the Surgical Resident commented frequently on plaintiff's looks, told her that she was too pretty to be a physician, asked her out on dates, and made disparaging remarks about plaintiff's fiancé.[65] A number of these comments were made in front of nurses, patients and classmates.[66]

Plaintiff never reported this behavior to anyone at NYCOM.[67]

### 7. The Radiologist

In her fourth year at NYCOM, plaintiff was assigned to a clinical rotation in radiology at St. Barnabas Hospital.[68] While there, she was sent to work with an attending radiologist who had taught her second-year radiology course at NYCOM and was in charge of all of the NYCOM students in the rotation (the "Radiologist").[69] During her four-week clinical rotation, the Radiologist referred to plaintiff as one of his "girls," asked her to go out with him, and put his arms around her

**52.** Crandell Dep. at 34.

**53.** *Id.* at 35–36.

**54.** *Id.*

**55.** *Id.* at 38.

**56.** *Id.* at 38–39.

**57.** *Id.*

**58.** *Id.* at 38.

**59.** *Id.* at 39.

**60.** *Id.* at 36.

**61.** *Id.*

**62.** *Id.* at 36–37.

**63.** *Id.* at 37.

**64.** *Id.* at 40–41.

**65.** *Id.* at 41–43.

**66.** *Id.* at 41–42.

**67.** *Id.* at 44.

**68.** *Id.* at 104–05.

**69.** *Id.* at 106.

numerous times.[70]

### 6. St. Barnabas Hospital Internship

After plaintiff graduated from NYCOM in 1998, she began a one-year paid medical internship at St. Barnabas Hospital.[71] During the first two months of this internship, she continued to experience problems with the Radiologist.[72] He asked her out on dates more than ten times, told her that he had made reservations at a dance studio for the two of them, and sometimes physically blocked her way in the hall in order to force her to talk to him.[73]

Two months into the internship, the Radiologist transferred to a different hospital.[74] Accordingly, no further incidents with him occurred. However, the harassment suffered by plaintiff did not cease, as she was subjected also to sexual comments and behavior from a number of other doctors at St. Barnabas.[75] Another attending radiologist ("Radiologist No. 2") with whom plaintiff frequently was assigned to work called plaintiff "gorgeous" and made other comments about her looks, told her that women could not handle a medical career, put his arms around her, and once began to change his clothes in front of her.[76] The chief surgical resident told plaintiff that he could prevent her from obtaining a position in the dermatology residency program at St. Barnabas and instructed her to read CAT scans with Radiologist No. 2 because Radiologist No.

2 was romantically interested in her.[77] Another surgical resident invited plaintiff on dates and to his house, frequently commented on her looks, put his arms around on her on one occasion, and followed her into the elevator in order to ride alone with her.[78] Finally, yet another surgical resident asked plaintiff out on numerous dates.[79]

In response to these incidents, plaintiff approached Dr. Peter Tilly, Director of Medical Education at St. Barnabas, in approximately October 1998.[80] She described to Dr. Tilly the incidents with the Radiologist, Radiologist No. 2, and the surgical residents and identified all of them by name.[81] After listening to plaintiff's allegations, Dr. Tilly responded that the harassment would have no effect on her application to the dermatology residency program at St. Barnabas and promised that if any of these doctors gave her a negative performance evaluation, he would destroy it.[82] He told her also that he would speak to Radiologist No. 2 about his behavior.[83] He did not offer to speak to any of the other physicians on her behalf or do anything else to remedy the situation.[84]

### NYCOM's Clinical Clerkship Rotation Program

As discussed above, many of the incidents complained of by plaintiff occurred during clinical clerkship rotations in area

---

**70.** *Id.* at 107–08.

**71.** *Id.* at 110.

**72.** *Id.* at 113–14.

**73.** *Id.*

**74.** *Id.* at 105.

**75.** *Id.* at 119–24.

**76.** *Id.* at 119–22.

**77.** *Id.* at 123, 125.

**78.** *Id.* at 123–24.

**79.** *Id.* at 124.

In the second amended complaint, plaintiff alleges also that a radiology resident at St. Barnabas stared at plaintiff's genital area and stated that plaintiff's husband would know her real hair color. Second Am. Cpt. ¶ 32. However, as plaintiff has offered no evidence to support this allegation, the Court will not consider it.

**80.** *Id.* at 115; Crandell Aff. ¶ 22.

**81.** Crandell Dep. at 117.

**82.** *Id.*

**83.** *Id.*

**84.** *Id.*

hospitals rather than on the NYCOM campus. These clinical rotations are a mandatory and major part of medical education at NYCOM[85]—the third year curriculum at NYCOM is made up exclusively, and the fourth almost exclusively, of clinical rotations.[86] During these two years, NYCOM students must do a total of 11 clinical clerkship rotations, each in a different subject, and each lasting from four to twelve weeks.[87] NYCOM is responsible for assigning students to rotations at particular hospitals.[88]

Students on clinical clerkship rotations are sent primarily to one of twenty NYCOM affiliated hospitals.[89] A hospital becomes affiliated with NYCOM by means of an affiliation agreement that lays out the terms and conditions of the relationship between NYCOM, the participating students, and the hospital.[90] This agreement provides that the primary purpose of the affiliation is to "design teaching programs ... to educate students in patient care" and refers to the affiliated hospital as the "Training Institution."[91] It provides also for periodic review by a NYCOM representative of the educational programs at the participating hospital and permits NYCOM to terminate the relationship if it is unsatisfied.[92]

NYCOM is responsible also for the design and management of clinical programs at the affiliated hospitals.[93] This is carried out primarily under the direction of Dr. Abraham Jeger, the Associate Dean of Clinical Affairs.[94] In significant part, these responsibilities involve selection of hospital personnel, all of whom are required to apply for and receive NYCOM adjunct faculty status, to supervise participating students.[95] These appointments are made by an executive faculty committee at NYCOM made up of senor faculty members.[96] In addition to selecting the adjunct faculty members, this committee conducts biannual reviews of all appointments.[97]

Once appointed, the adjunct faculty members are required either to supervise participating students directly or, where students are supervised by non-adjunct members of the hospital staff, to review all of the participating students' work.[98] These adjunct faculty are not paid by NYCOM and therefore cannot be fired by NYCOM in case of misconduct.[99] However, NYCOM at any time can terminate a hospital staff member's adjunct appointment and prevent that person from teaching NYCOM students on clinical rotations.[100] Further, NYCOM can recommend to the hospital employing the individual that he or she be relieved.[101]

The affiliation agreement between NYCOM and the participating hospital contains a provision governing discrimi-

---

85. Schiowitz Dep. at 22–23 (Pl.Mem.Ex. E).

86. *Id.*

87. Affiliation Agreement ¶ II (Pl.Mem.Ex. G).

88. *Id.* ¶ V(1).

89. Schiowitz Dep. at 23.

90. Affiliation Agreement.

The only affiliation agreement in the record involves NYCOM and Lutheran Hospital. For purposes of this motion, the Court assumes that the relationships between NYCOM and the other affiliated hospitals are governed by similar agreements.

91. *Id.* ¶ II.

92. *Id.* ¶ IV.

93. Schiowitz Dep. at 24–25.

94. *Id.* at 24.

95. *Id.* at 27.

96. *Id.* at 29.

97. *Id.*

98. *Id.* at 27–33.

99. *Id.* at 45, 62–63.

100. *Id.*

101. *Id.*

nation.[102] This clause prohibits both NYCOM and the training institution from "discriminat[ing] against any clinical clerk in his/her assignment, hereunder or in his/her training course of study by reason of ... sex ...."[103]

*NYCOM's Sexual Harassment Policy*

At all relevant times, NYCOM maintained a policy on sexual harassment.[104] This policy was published annually in the NYCOM student handbook, and plaintiff received this handbook in at least her first and third years of medical school.[105] This policy states that sexual harassment, discrimination or intimidation will not be tolerated and directs aggrieved students to contact the Assistant Dean for Student Affairs.[106] From 1991 to 1997, this position was held by Dr. Eileen DiGiovana, who became Associate Dean for Student Affairs in 1997.[107]

The Office of the Assistant Dean for Student Affairs is authorized by NYCOM to hear and investigate all student complaints of discrimination and sexual harassment.[108] This includes not only complaints of harassment occurring on NYCOM's campus, but also complaints by students enrolled in clinical clerkship rotations regarding harassment or discrimination during the rotations.[109] When the Assistant Dean for Student Affairs receives a formal complaint of harassment, she writes a report detailing the complaint to the dean of the area to which the named faculty member belongs.[110]

The Assistant Dean does not follow up on complaints of sexual harassment that fall into certain categories. She hears only complaints that are brought directly by the students involved, rather than complaints brought by faculty members on behalf of students,[111] despite the fact that certain students might feel more comfortable confiding in faculty members than in the Assistant Dean.[112] For instance, Dr. DiGiovana testified that she would not follow up or even make a note of a report of sexual harassment unless the student came directly to her.[113] Thus, she would not act if a report were made by a faculty member on behalf of a student.[114] Further, the Assistant Dean does not always follow up on complaints lodged by students. Dr. DiGiovana testified that if a student came to her with a report of harassment but asked that nothing be done, she would not act on the complaint.[115]

*Plaintiff's Claims*

Plaintiff has asserted six claims under Title IX and New York State and City Human Rights Laws:

- Count I alleges that defendants created a hostile educational environment constituting sexual harassment in violation of Title IX.

- Count II asserts that defendants discriminated against plaintiff on the basis of her sex in violation of Title IX.

- Count III charges defendants with creating a hostile environment constituting sexual harassment in violation

102. Affiliation Agreement ¶ XVI.

103. *Id.*

104. Def. Rule 56.1 Stmt. ¶¶ 16–17; Pl. Resp. to Def. Rule 56.1 Stmt. ¶¶ 16–17.

105. *Id.*

106. *Id.* ¶¶ 17–18, 20; NYCOM Student Handbook at 3 (Murphy Repl. Aff. at Ex. 3).

107. DiGiovana Dep. ¶ 1 (Pl.Mem.Ex. D).

108. Def. Rule 56.1 Stmt. ¶ 19; Pl. Resp. to Def. Rule 56.1 Stmt. ¶ 19.

109. DiGiovana Dep. ¶ 74.

110. *Id.* ¶ 84.

111. *Id.* ¶ 46.

112. *Id.* ¶¶ 53–54.

113. *Id.* ¶ 46.

114. *Id.*

115. *Id.* ¶ 33.

of the New York State Human Rights Law.

- Count IV claims that defendants discriminated against plaintiff on the basis of her sex in violation of the New York State Human Rights Law.
- Count V seeks to hold defendants liable for creating a hostile environment constituting sexual harassment in violation of the New York City Human Rights Law.
- Count VI asserts that defendants discriminated against plaintiff on the basis of her sex in violation of the New York City Human Rights Law.

### Defendants' Motion

Defendants now move to dismiss Counts I and II on the grounds that (1) plaintiff fails to state a claim for sexual harassment because the incidents alleged are not sufficiently severe or pervasive to alter the conditions of the educational environment, (2) defendants did not have actual notice of the harassment suffered by plaintiff in any event, and (3) plaintiff's claims are moot. Defendants move also to dismiss Counts III, IV, V and VI on the grounds that (1) the State and City Human Rights Laws do not apply to discrimination in education,

but only employment discrimination, and (2) as the federal claims must be dismissed in any case, there is no independent basis for federal jurisdiction over the state and city claims, and the Court should decline to exercise supplemental jurisdiction.

### Discussion

#### A. Failure to State a Claim

■ In order to state a claim under Title IX, a plaintiff must allege that she has been "excluded from participation in, ... denied the benefits of, or ... subjected to discrimination under" any educational program receiving federal funding on the basis of gender.[116] "Discrimination" is defined as disparate provision of programs, aid, benefits or services or inequitable application of rules or sanctions.[117] It includes both *quid pro quo* and hostile educational environment sexual harassment.[118] Plaintiff's claims appear based primarily on a theory of hostile educational environment, although her allegation concerning the Lutheran Hospital Resident's allegedly coercive lunch requests and related behavior arguably involves *quid pro quo* harassment as well.[119]

■ In order to state a claim for hostile environment harassment, plaintiff

---

**116.** 20 U.S.C. § 1681(a).

**117.** 45 C.F.R. § 86.31 (2000).

This includes disparate access to course offerings, *id.* § 86.34, and athletic programs, *id.* § 86.41, and disparate provision of health and insurance benefits or services, *id.* § 86.39, employment assistance, *id.* § 86.38, financial assistance, *id.* § 86.37, and counseling and counseling materials, *id.* § 86.36.

**118.** *See Smith v. Metropolitan Sch. Dist. Perry Township,* 128 F.3d 1014, 1021 (7th Cir.), reh'g en banc denied (1997), cert. denied, 524 U.S. 951, 118 S.Ct. 2367, 141 L.Ed.2d 736 (1998); *Morse v. Regents of the Univ. of Colorado,* 154 F.3d 1124, 1127 (10th Cir.1998); *Pell v. Trustees of Columbia Univ.,* 97 Civ. 0193(SS), 1998 WL 19989, *11 (S.D.N.Y. Jan. 21, 1998).

These categories have been set forth also in Title VII cases, which utilize the same legal standard as applies to claims under Title IX. *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17,

21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (to state claim under Title VII, plaintiff must show either *quid pro quo* sexual harassment or hostile work environment); *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65–66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (same); *Karibian v. Columbia Univ.,* 14 F.3d 773, 777 (2d Cir.) (same), cert. denied, 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994); *Torres v. Pisano,* 116 F.3d 625, 630 n. 3 (2d Cir.) (same legal standards apply in Title IX cases as in Title VII cases), cert. denied, 522 U.S. 997, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997); *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243, 248 (2d Cir.1995) (same).

**119.** In the second amended complaint, plaintiff brings a claim for hostile educational environment (Count I) and sex discrimination (Count II). In order to avoid interpreting these claims as duplicative, the Court assumes that Count II refers to alleged *quid pro quo* sexual harassment committed by the Lutheran Hospital Resident.

must allege that she was subjected to " '[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature' " [120] and that this behavior was "sufficiently severe or pervasive 'to alter the conditions of [her] and create an abusive [educational] environment.' " [121] The consequences of the harassment are analyzed from the perspective of a reasonable person.[122]

Defendants argue that the incidents alleged were not sufficiently severe or pervasive to qualify as hostile educational environment harassment. They claim that although plaintiff's allegations, when considered together, arguably might suggest a hostile educational environment, most of these allegations must be excluded from consideration because they either (1) are properly covered only by Title VII rather than Title IX, (2) did not occur as part of an educational program or activity at NYCOM, (3) are time barred, or (4) are too minor to constitute harassment. When these allegations are stripped away, defendants contend, any that remain are insufficient to state a claim under Title IX.

### 1. *Application of Title VII Rather than Title IX*

■ Defendants argue that the allegations concerning plaintiff's paid post-graduate internship at St. Barnabas Hospital should be dismissed because they do not fall within the ambit of Title IX. They contend that the post-graduate internship was employment, rather than an "educational program or activity," as Title IX

requires. Therefore, they claim, the allegations are covered, if at all, by Title VII and accordingly should be dismissed.

By Order dated June 30, 1999, this Court dismissed plaintiff's Title IX claims as against St. Barnabas on the ground *inter alia* that the allegations concerning the post-graduate internship were actionable only under Title VII.[123] Although that Order did not dismiss the Title IX allegations relating to the internship as against NYCOM and NYIT, the same reasoning applies. Accordingly, plaintiff's allegations concerning the internship are dismissed also as against NYCOM and NYIT.

### 2. *Association with NYCOM Educational Programs or Activities*

Defendants contend that several of plaintiff's allegations should not be considered because they occurred off campus and therefore not in connection with an educational program or activity at NYCOM.[124] These include claims that Professor No. 1 kissed her against her will in her apartment and asked her for a date while both were in a local bar and that the Cardiologist pressed his erect penis against her during a heart examination in his private office. They include also the allegations of harassment during the clinical clerkship rotation at Lutheran Hospital.[125]

### a. *Professor No. 1 and the Cardiologist*

■ Defendants' contention that the incidents involving Professor No. 1 and the Cardiologist should be excluded from con-

---

**120.** *Meritor,* 477 U.S. at 65, 106 S.Ct. 2399 (citing 29 C.F.R. § 1604.11(a) (1985)).

**121.** *Id.* at 67, 106 S.Ct. 2399 (citing *Henson v. Dundee,* 682 F.2d 897, 904 (11th Cir.1982)). *See also Murray v. New York Univ. Coll. of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995) (applying the *Meritor* standard to a Title IX claim).

**122.** *See Oncale v. Sundowner Offshore Serv. Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); *Harris,* 510 U.S. at 21, 114 S.Ct. 367.

**123.** *Crandell v. New York College of Osteopathic Medicine, et al.,* 99 Civ. 2347 (Order, Jun. 30, 1999) (LAK).

**124.** By its terms, Title IX applies only to discrimination "under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a).

**125.** Curiously, defendants make this argument with respect only to plaintiff's allegations of misconduct at Lutheran Hospital and not to her allegations of harassment during other clinical clerkship rotations.

sideration merely by virtue of their location is unsupportable. Courts frequently have upheld sexual harassment claims under Title IX where some or all of the alleged misconduct occurred off campus.[126] In all of those cases, the perpetrator was a faculty or staff member at the federally funded institution, and the plaintiff alleged that the off campus incidents had created a hostile environment in the institution.[127]

In this case, plaintiff claims that the incidents involving Professor No. 1 made her feel frightened and uncomfortable and consequently caused her to miss her anatomy class.[128] She alleges further that the incident in the Cardiologist's office caused her to fear that his prominence at NY-COM would have a negative effect on her medical career.[129] As she alleges a nexus

between the off campus misconduct and a hostile environment at the institution, these allegations are relevant to plaintiff's claims of actionable sexual harassment.[130]

Defendants argue further that because the Cardiologist no longer was plaintiff's professor at the time the alleged harassment occurred, his misconduct did not occur "under [an] education program or activity" as required by Title IX.[131] This contention is without merit as well. Actionable sexual harassment is not limited to that committed by a current teacher, but includes that committed by former teachers, staff and even other students if the presence of the perpetrator at the institution would be expected to create a hostile environment.[132] In this case, al-

126. See, e.g., Doe v. Lago Vista Indep. Schl. Dist., 106 F.3d 1223 (5th Cir.1997) (upholding Title IX claims where all sexual contact occurred off school property), rev'd on other grounds sub nom. Gebser v. Lago Vista Indep. Schl. Dist., 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998); Doe v. Claiborne Cty., Tenn., 103 F.3d 495 (6th Cir.1996) (upholding claim were some incidents of misconduct took place off campus); Warren v. Reading Schl. Dist., 97 Civ. 4064, 2000 WL 122353 (E.D. Pa. Jan. 31, 2000); Doe v. School Admin. Dist. No. 19, 66 F.Supp.2d 57 (D.Maine 1999) (upholding claim where all misconduct occurred off campus); Donovan v. Mount Ida College, 96 Civ. 10289(RGS), 1997 WL 259522 (D. Mass. Jan. 3, 1997) (some incidents of misconduct occurred off campus); Patricia H. v. Berkeley Unified Schl. Dist., 830 F.Supp. 1288, 1296–97 (N.D.Cal.1993) (all misconduct occurred off campus).

127. Id. Cf. Lam v. Curators of the Univ. of Missouri Kansas City Dental School, 122 F.3d 654 (8th Cir.1997) (summary judgment appropriate where harassment occurred off campus and plaintiff failed to allege a nexus between harassment and hostile environment in the institution).

128. Crandell Dep. at 55.

129. Id. at 80.

130. Defendants cite also Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999), which found that "[w]here ... the misconduct occurs during school hours and on school grounds ... [it] is taking place 'under' an 'operation' of

the funding recipient." Id. at 1672. Defendants claim that, as "neither the exam [in the Cardiologist's office] nor the kiss occurred in these required forums," neither is actionable under Davis. Def. Mem. at 14. However, defendants analysis of Davis is logically flawed. That the misconduct took place during school hours and on school grounds was found by the Court to be a sufficient, not a necessary, condition for liability. In other words, Davis did not limit the circumstances in which institutional liability will lie to harassment occurring during school hours and on school grounds, but found merely that such conditions give rise to an inference of control by and therefore liability of the institution.

131. Def. Mem. at 11.

132. See, e.g., Davis, 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (harassment by another student); Morse, 154 F.3d 1124 (harassment by fellow student who was higher ranking cadet in ROTC program); Mary M. v. North Lawrence Community School Corp., 131 F.3d 1220 (7th Cir.1997) (harassment by school cafeteria worker), cert. denied, 524 U.S. 952, 118 S.Ct. 2369, 141 L.Ed.2d 737 (1998); Smith v. Metropolitan School Dist. Perry Twnshp., 128 F.3d 1014 (7th Cir.1997) (harassment by swim coach), cert. denied, 524 U.S. 951, 118 S.Ct. 2367, 141 L.Ed.2d 736 (1998); Doe, 103 F.3d 495 (harassment of female student by boys' baseball coach); Doe, 66 F.Supp.2d 57 (harassment by faculty member who was not plaintiff's teacher); Patricia H., 830 F.Supp. at 1296–97 (same).

though plaintiff does not allege that the Cardiologist's actual physical presence at the school created a hostile environment, she claims that, following the incident in his office, she feared that his prominent position at NYCOM would damage her medical career.[133] This is sufficient to meet the required standard.

### b. Clinical Clerkship Rotations

■ Defendants' effort to exclude plaintiff's allegations of misconduct during her clinical clerkship rotation at Lutheran Hospital also is unavailing. Title IX applies to any "education program or activity receiving Federal financial assistance."[134] Congress has explained that this includes not only programs operated by the recipient of federal funds, but also programs not wholly operated by the recipient if the recipient "requires participation" by any student therein or if the recipient "facilitates, permits, or considers such participation as part of or equivalent to an education program or activity operated by such recipient . . . ."[135]

The clinical clerkship rotations required of NYCOM students clearly fall within this category. NYCOM indisputably is a federally funded institution.[136] Although not wholly operated by NYCOM, the clinical rotations are a mandatory part of its curriculum.[137] NYCOM assigns students to rotations in particular hospitals and is responsible for the design and management of the programs and selection of hospital personnel to supervise students.[138] These supervisory personnel must receive adjunct faculty status at NYCOM, and the appointments are reviewed biannually by an executive faculty committee made up of senior NYCOM faculty members.[139] This evidence strongly supports a finding that the alleged harassment in clinical clerkship rotations occurred "under [an] education program or activity receiving Federal financial assistance," as required by Title IX.

Defendants take exception to this conclusion as applied to the allegations of harassment by the Lutheran Hospital Resident. They point out that, at the time of his alleged misconduct, the Lutheran Hospital Resident was merely a resident, not an attending physician, and therefore did not have adjunct faculty status at NYCOM.[140] Because the Lutheran Hospital Resident was never an employee of NYCOM, they argue, NYCOM did not "control" him and consequently cannot be held accountable for his actions.[141]

This argument is something of a *non sequitur.* Although NYCOM certainly did not "control" the Lutheran Hospital Resident in the sense that it could not fire him, it exerted significant control over the affiliation between Lutheran and NYCOM, the placement of NYCOM students in the Lutheran clinical rotation, and the selection of adjunct clinical appointees at Lutheran who directly or indirectly supervised all participating students. Further, that NYCOM did not directly "control" the Lutheran Hospital Resident is beside the point, as Title IX applies not only to harassment by individuals in the employ of the federally funded institution, but also to harassment occurring in programs not operated by the recipient if student participation in such programs is required by the recipient, which is exactly the case here. In consequence, plaintiff's allega-

**133.** Crandell Dep. at 80.

**134.** 20 U.S.C. § 1681(a). The statute contains several exceptions, none of which applies.

**135.** 45 C.F.R. § 86.31(d)(1) (2000).

**136.** Joint Pre-trial Order ("PTO") § I, ¶ 1.

**137.** *See supra* notes 85–101 and accompanying text.

**138.** *Id.*

**139.** *Id.*

**140.** Def. Mem. at 18–19.

**141.** *Id.*

tions of harassment in the clinical clerk-ship rotations, including at Lutheran Hospital, do not fall outside the ambit of Title IX.

### 3. *Timeliness*

Defendants claim also that the incidents involving Professor No. 1 and Professor No. 2, two of plaintiff's anatomy professors during her first year, may not be considered because they are time barred. In view of the disposition of the claims based on their alleged actions on other grounds, however, it is unnecessary to resolve this question.

### 4. *Other Incidents*

Defendants argue that a number of the incidents alleged by plaintiff were minor and do not rise to the level of actionable sexual harassment. These include the Lutheran Hospital Resident's allegedly coercive invitations to lunch, which defendants contend do not support a claim for *quid pro quo* harassment. This includes further several of the incidents involving Professor No. 1,[142] Professor No. 2, the Lutheran Hospital Resident, the Gastroenterologist, the Surgical Resident and the Radiologist, which defendants contend do not qualify as hostile environment harassment.

#### a. *Allegation of Quid Pro Quo Harassment*

■ Defendant asserts that the Lutheran Hospital Resident's alleged demands that plaintiff spend time and have lunch with him or face a poor evaluation does not

constitute *quid pro quo* sexual harassment because he did not explicitly demand sex from plaintiff.[143] This contention is without merit. In order to state a claim for *quid pro quo* harassment, plaintiff must allege that "a tangible employment [or educational] action resulted from a refusal to submit to a supervisor's sexual demands." [144] This standard applies equally to Title IX and Title VII cases.[145]

■ Plaintiff clearly has put forth evidence that supports such a showing. She claims that the Lutheran Hospital Resident often put his arms around her and made numerous sexual comments to her, including references to the size of her breasts.[146] She alleges that he asked her to lunch and warned her that he would fail her for the rotation if she refused to spend time and have lunch with him regularly. She declined all but one of his lunch invitations and received a poor grade for the rotation.

Although not explicitly couched in sexual terms, the Lutheran Hospital Resident's demands that plaintiff spend time and eat lunch with him reasonably could be interpreted as unwelcome sexual advances, given the totality of his frequent and highly inappropriate alleged behavior toward plaintiff. In consequence, summary judgment on the *quid pro quo* claim is inappropriate.

#### b. *Allegations of Hostile Environment Harassment*

■ Defendants argue also that a number of plaintiff's allegations should be dis-

---

142. Defendants argue only that Professor No. 1's repeated requests for dates do not constitute hostile environment harassment. Def. Mem. at 10. They do not claim that the unsolicited kiss is not sexual harassment.

143. Def. Mem. at 19–20.

144. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). *See also Wills v. Brown Univ.*, 184 F.3d 20, 25 (1st Cir.1999) (defining *quid pro quo* harassment as occurring "when some

benefit or adverse action, such as change in salary at work or a grade in school, is made to depend on providing sexual favors to someone in authority . . . .").

145. *See Liu v. Striuli*, 36 F.Supp.2d 452, 465 (D.R.I.1999); *Lawrence v. Central Conn. St. Univ.*, 96 Civ. 1492(AHN), 1997 WL 527356, *3 (D.Conn. Aug. 19, 1997).

146. *See supra* notes 36–42 and accompanying text.

regarded because they are too minor to constitute hostile environment harassment. These include Professor No. 1's requests for dates,[147] Professor No. 2's inappropriate comments in class,[148] the Lutheran Hospital Resident's comments about plaintiff's breasts,[149] the Gastroenterologist's inappropriate remarks about plaintiff's physical appearance,[150] the Surgical Resident's comments and requests for dates,[151] and the Radiologist's request that plaintiff go dancing with him.[152]

Defendants are misguided. Some groups of related incidents alleged by plaintiff arguably are sufficient, standing alone, to state a claim for hostile environment harassment. The Lutheran Hospital Resident's frequent sexual comments, including a number of remarks about the size of plaintiff's breasts, are perhaps the clearest example, particularly given the short time span within which they allegedly occurred as well as the fact that they often were made in the presence of patients and hospital staff, increasing plaintiff's humiliation.[153] The unequal power relationship between plaintiff and the Lutheran Hospital Resident, who was charged with evaluating her performance, further supports the conclusion that the incidents involving the Lutheran Resident alone created a hostile environment.

Further, whether each of plaintiff's allegations, standing alone, states a hostile environment claim is beside the point. In evaluating hostile environment claims, courts have adopted a "totality of the circumstances" approach that rejects disaggregation of the allegations and requires only that the alleged incidents cumulatively have resulted in the creation of a hostile environment.[154] In consequence, defendants' effort to disaggregate and thereby defeat plaintiff's allegations is contrary to law.

## B. *Actual Notice of Harassment*

Defendants contend, in the alternative, that even if the incidents alleged were sufficiently severe and pervasive to constitute hostile environment harassment, liability does not lie because plaintiff failed to provide NYCOM with adequate notice of the harassment.[155] Plaintiff responds that her reports to Drs. Eng and Jeger concerning the harassment at Lutheran Hospital provided the hospital with sufficient notice and that, in light of NYCOM's failure to take action against the harassment following her first complaints, she reasonably did not report subsequent incidents.[156]

The Supreme Court has held that Title IX liability attaches only if the federally funded institution has actual knowledge of the discrimination.[157] This requirement is derived from the policies underlying Title IX, which seek primarily to put an end to discriminatory practices rather than to

147. Def. Mem. at 10.

148. *Id.* at 8 n. 4.

149. *Id.* at 21.

150. *Id.* at 8 n. 4

151. *Id.*

152. *Id.* at 25.

153. *See supra* notes 36–42 and accompanying text.

154. *See Harris,* 510 U.S. at 22, 114 S.Ct. 367 ("[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances."); *Richardson v. New York St. Dep't of Corr. Serv.,* 180 F.3d 426, 437 (2d Cir.1999) (In evaluating allegations of sexual harassment, the court must examine the "quantity, frequency, and severity of the incidents. The factors must be considered cumulatively ....") (internal quotations omitted); *Williams v. General Motors Corp.,* 187 F.3d 553, 561–62 (6th Cir.1999) ("[T]he issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case.").

155. Def. Mem. at 7, 12–15, 24–25.

156. Pl. Mem. at 23–24.

157. *Gebser,* 524 U.S. at 290, 118 S.Ct. 1989.

compensate all victims of harassment.[158] Consistent with these goals, Title IX rejects strict liability, which would compensate all victims regardless of the institution's knowledge of the harassment, and adopts instead a theory of liability based on institutional culpability that concentrates enforcement efforts on harassment that the institution can prevent by virtue of the fact that it is on notice.[159]

■ Although the actual knowledge standard has been applied repeatedly by courts since *Gebser v. Lago Vista Independent School District,*[160] its contours have yet to be fully defined. Clearly, the institution must have actual knowledge of at least some incidents of harassment in order for liability to attach, as this is the thrust of *Gebser.* It is equally evident, however, that actual knowledge of every incident could not possibly be required, as this would burden the plaintiff unfairly in cases of frequent harassment to report many separate incidents to the appropriate authorities and would oblige the court to determine whether each incident alleged was reported and therefore is actionable. Suffice it to say, in light of *Gebser,* that the institution at minimum must have possessed enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based.[161] This

minimum standard is appropriate because it adopts *Gebser*'s focus on institutional culpability while not putting an unrealistically heavy burden on Title IX plaintiffs.

■ The cases are clearer about who at the institution is required to know of the harassment in order for institutional liability to attach. *Gebser* held that there is no Title IX liability unless "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [institution's] behalf" has actual knowledge of the harassment.[162]

■ In light of these standards, plaintiff indisputably has put forth sufficient evidence to support a finding that NYCOM was on notice of the Lutheran Hospital Resident's alleged misconduct. She asserts that she reported the harassment to both Dr. Eng, an adjunct faculty member at NYCOM, and Dr. Jeger, NYCOM's Associate Dean of Clinical Affairs.[163] Although Dr. Eng's authority to take corrective measures is not discussed in the record, she apparently was in charge of all medical students on clinical rotations at Lutheran and therefore may have had some authority to remedy the harassment. Dr. Jeger unquestionably had authority to take corrective measures, as he was primarily responsible for the design and management of NYCOM's clinical programs at affiliated hospitals, including selection of

---

**158.** *Id.* at 287, 118 S.Ct. 1989.

**159.** *Id.* at 287–90, 118 S.Ct. 1989.

**160.** 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277. *See, e.g., Davis,* 119 S.Ct. at 1664; *Bruneau v. South Kortright Cent. School Dist.,* 163 F.3d 749, 759 (2d Cir.1998), cert. denied, 526 U.S. 1145, 119 S.Ct. 2020, 143 L.Ed.2d 1032 (1999); *Wills,* 184 F.3d at 26; *Ericson v. Syracuse Univ.,* 35 F.Supp.2d 326, 328 (S.D.N.Y.1999).

**161.** *See generally Gebser,* 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (knowledge of inappropriate comments by teacher does not put school district on notice of teacher's sexual relationship with student); *Ericson,* 35 F.Supp.2d 326 (actual knowledge that teacher

has been harassing female students for twenty years is sufficient to put university on notice as to harassment of plaintiffs); *Doe,* 66 F.Supp.2d 57 (notice that teacher was dating students and possibly having a sexual relationship with a student was sufficient to put school on notice of that teacher's harassment of plaintiff, even though school did not know that plaintiff in particular was a victim); *Liu,* 36 F.Supp.2d 452 (knowledge that plaintiff is involved in a consensual sexual relationship with professor does not put the institution on notice of a coercive, non-consensual relationship).

**162.** 524 U.S. at 290, 118 S.Ct. 1989.

**163.** *See supra* notes 43–51 and accompanying text.

hospital personnel to supervise participating students. This evidence clearly is sufficient to meet the standard required by *Gebser*.

That plaintiff failed to follow the complaint procedure laid out in NYCOM's sexual harassment policy, which directs an aggrieved student to the Assistant Dean of Student Affairs, fails to undermine this conclusion for two reasons. First, under *Gebser* and its progeny, an aggrieved student or employee need not follow the institution's official route for reporting sexual harassment. She merely must report to someone with authority to take corrective measures.[164] Second, plaintiff's choice to go to Dr. Jeger, rather than to Dr. DiGiovana, the Assistant Dean of Student Affairs, is of little practical consequence. In her deposition testimony, Dr. DiGiovana stated that, were she to receive a formal sexual harassment complaint from a student, she would submit a report of the complaint to the dean of the appropriate division of the school. In this case, as plaintiff was enrolled in a clinical clerkship rotation, the dean of the appropriate division was Dr. Jeger.[165] Plaintiff thus did not circumvent official procedures by complaining directly to Dr. Jeger. She merely skipped a step in the hierarchy. In consequence, because plaintiff informed Dr. Jeger of the harassment she suffered at Lutheran Hospital, NYCOM can be charged with actual knowledge of this harassment.

That NYCOM had actual knowledge of the incidents at Lutheran is only the beginning of the inquiry, however. Plaintiff's claims in this case are based on numerous incidents involving a number of perpetrators over the course of four years.

That NYCOM had actual notice of the Lutheran Hospital Resident's misconduct does not necessarily mean that it had knowledge also of the other incidents of which plaintiff complains. In order to be consistent with the goals of Title IX as articulated by *Gebser*, the actual knowledge requirement demands at minimum that the institution have had sufficient notice that it reasonably could have acted to remedy the discrimination that forms the basis of plaintiff's claim. Plaintiff's claim fails to meet this standard. Her report to Drs. Eng and Jeger was limited to the misconduct of the Lutheran Hospital Resident and provided no reasonable indication that harassment had occurred elsewhere at NYCOM or its affiliated hospitals. NYCOM, therefore, could not reasonably have been expected to respond to her complaint by investigating possible harassment in other clinical rotations, on the NYCOM campus, and involving NYCOM faculty. NYCOM simply was not on notice of any larger problem.

In consequence, defendants' motion to dismiss plaintiff's Title IX claims is granted as to all allegations except those concerning harassment by the Lutheran Hospital Resident. Her allegations of harassment at Lutheran Hospital remain in the case both with respect to Count I, which charges NYCOM with hostile environment harassment,[166] and Count II, which alleges *quid pro quo* sexual harassment.[167]

### C. *Mootness*

Defendants contend in the alternative that plaintiff's graduation from NYCOM in 1998, well before she filed the complaint in this action, moots her Title IX

---

164. *See Kotcher v. Rosa and Sullivan Appliance Ctr.*, 957 F.2d 59, 64 (2d Cir.1992) (reporting sexual harassment to supervisor at a sufficiently high level can be the basis for liability of the corporation even if plaintiff failed to utilize established procedures for reporting discrimination); *Alonzo v. Chase Manhattan Bank, N.A.*, 70 F.Supp.2d 395 (S.D.N.Y.1999) (complaint to senior corporate official is a reasonable response to workplace discrimination even though employee hand-book directed victims of discrimination to the Human Resources Department).

165. DiGiovana Dep. at 84.

166. *See supra* note 153 and accompanying text.

167. *See supra* notes 143–46 and accompanying text.

claims.[168] This argument will be considered with respect only to plaintiff's allegations of harassment at Lutheran Hospital, as her Title IX claims have been dismissed as to all other allegations for the reasons specified above.

Defendants are correct that a claim of educational discrimination can become moot when the plaintiff graduates.[169] However, this applies only where the relief requested is prospective in nature, as prospective relief cannot redress a graduated plaintiff's injuries, and such a plaintiff therefore lacks a personal stake in the outcome of the litigation.[170] On the other hand, where, as here, the complaint requests money damages, a favorable outcome will redound directly to plaintiff's benefit[171] and the mootness doctrine presents no barrier. Accordingly, defendants' motion to dismiss for mootness is frivolous, grossly misstates the law, and is denied.

### D. *State and City Claims*

As defendants' motion to dismiss Counts I and II has been granted with respect to all but plaintiff's allegations of harassment at Lutheran Hospital, the Court declines to exercise supplemental jurisdiction over the comparable aspects of Counts III, IV, V and VI.

### *Conclusion*

In light of the foregoing, the complaint is dismissed except with respect to the claims of hostile environment and *quid pro quo* harassment by the Lutheran Hospital Resident. The dismissal is on the merits with respect to Counts I and II and otherwise for lack of subject matter jurisdiction.

SO ORDERED.

---

**168.** Def. Mem. at 25–26.

**169.** *See, e.g., Cook v. Colgate Univ.,* 992 F.2d 17 (2d Cir.1993); *Alexander v. Yale Univ.,* 631 F.2d 178 (2d Cir.1980).

**170.** *Alexander,* 631 F.2d at 183.

**171.** *See Boucher v. Syracuse Univ.,* 164 F.3d 113, 118 (2d Cir.1999); *Cook,* 992 F.2d at 19. *See also* 13A CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE: JURISDICTION 3D § 3533.3, at 262 (2d ed.1984).