Wanda JOHNSON, Plaintiff,

v.

GALEN HEALTH INSTITUTES, INC.
d/b/a The Health Institute of
Louisville, Defendant.

No. CIV.A.3:02CV–243–H.

United States District Court,
W.D. Kentucky.

June 16, 2003.

Elizabeth Nugent Monohan, Kathryn A. Quesenberry, Woodward, Hobson & Fulton, Louisville, KY, for defendant.

Sean Ragland, Bolus & Ragland, Louisville, KY, for plaintiff.

## MEMORANDUM OPINION

HEYBURN, Chief Judge.

Plaintiff Wanda Johnson alleges that Defendant Galen Health Institutes, Inc. d/b/a the Health Institute of Louisville ("HIL") violated Title IX of the federal Civil Rights Act of 1972, which prohibits gender discrimination in federally funded educational institutions.[1] First, under § 901, she asserts that HIL discriminated against her by exhibiting deliberate indifference to known sex discrimination.[2] Second, Johnson asserts that her expulsion amounts to retaliation also prohibited by § 901. Defendant HIL moved for summary judgment, arguing that all of Johnson's theories fail. This case requires the Court to consider several novel legal questions in light of the Supreme Court's recent opinions in *Gebser v. Lago Vista Indep. School Dist.*, 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998), and *Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), delineating the tests for sexual discrimination under Title IX and implied private rights of action, respectively.

After carefully considering all issues, the Court holds that Johnson has not adequately pled the hostile environment aspect of her sexual discrimination claim under Title IX and that, furthermore, the *quid pro quo* element of her claim also fails because she has not shown that HIL had notice of the activity. On the other hand, the Court concludes that the Department of Education has reasonably construed § 901 of Title IX to forbid retaliation to the extent that this prohibition is premised on opposition to intentional discrimination. This prohibition is therefore enforceable via the existing implied private right of action under that section. The Court need not analyze whether a separate implied private right of action exists and Plaintiff's claim for retaliation may proceed.[3]

## I.

The facts in this case, although somewhat disputed at critical points, are relatively straightforward. Plaintiff Wanda

---

1. Plaintiff has also filed a motion to amend her complaint, adding a claim that HIL violated Title IX by retaliating against her. Under Fed.R.Civ.P. 15(a), leave to amend "shall be freely given when justice so requires." The Court does not necessarily see the need for this amendment since the retaliation claim also falls under § 901 of Title IX and Plaintiff sufficiently pled facts in her initial complaint to put Defendant on notice of the retaliation claim. Furthermore, Defendant adequately addressed this retaliation argument in its motion for summary judgment. Defendant is not unduly prejudiced by Plaintiff's failure to separately state her retaliation claim. Therefore, the Court sustains Plaintiff's motion to amend her complaint to the extent this will help clear up the record.

2. Plaintiff actually alleges two separate theories of the underlying discrimination: sexual harassment and *quid pro quo* discrimination.

3. Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "At the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter." *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir.1994). The Court's role is limited to determining if the evidence submitted viewed in a light most favorable to the non-moving party presents a sufficient disagreement about the material facts so that submission to trier of fact is necessary, or whether the evidence is so one-sided that a party must prevail as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202(1986). A dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at·251–52, 106 S.Ct. 2505.

Johnson is a 44 year-old woman and a former student at the Health Institute of Louisville ("HIL"). During October 2000, she enrolled in HIL to complete the academic requirements to become a licensed practical nurse. By the summer of 2001, when Johnson began her third quarter, she took a month-long class with Nurse Instructor Donte Wheat. The course included a weekly three-hour classroom lecture and one day of clinical work at Kosair Children's Hospital ("Kosair").

During this month, Johnson claims Wheat made several comments and physically touched her in ways that made her exceedingly uncomfortable and unable to focus on her education. The specifics of her claim are important. First, Johnson says that on the days she worked at Kosair, Wheat required the students to sit with him in the cafeteria. She says that each day, she sat down first and he would come sit next to her. Allegedly, he would press his leg up against the side of hers under the crowded table. This happened on at least four occasions. She says, she moved her leg away and he would try and scoot over to touch her again. Similarly, she alleges that once while they were on an elevator, Wheat pressed the front of his body against her back. Second, Johnson claims that several of Wheat's comments in class were entirely inappropriate. She says he "almost all the time" referred to breasts as "boobies" and "cha-chas," the buttocks as the "ass," and at least once called the penis "dick." Johnson says this was offensive and degrading to her. These remarks occurred during the twice-a-week lectures. Third, she alleges that on one occasion, Johnson was demonstrating electrocution therapy and asked the class where the human body would most strongly feel the shock. Students responded that it would be felt by the hands, the feet, and other extremities. Wheat apparently told them they were all wrong

and said the correct answer was "the dick" and said that the thought of that put him in pain.

Furthermore, Johnson alleges that on the last day of her clinical at Kosair, Wheat sexually propositioned her. She says that she made a mistake while assessing a patient's blood pressure and that this incited Wheat's alleged bad temper. He apparently exclaimed, "What makes you think you have the luxury of making mistakes?" He then reached for her arm, put one hand on her elbow and another on her shoulder. She claims she turned away from him and he reached across with one arm to turn her back. She responded, "I'm not interested." He replied "That's the wrong answer to give on the last day of clinical." It is undisputed that he failed her. At her subsequent evaluation meeting, Wheat told her she failed because she gave the wrong answer to "one question." When she asked which one, he responded, "You know what question it is." Additionally, it also appears that Wheat initially gave Johnson a satisfactory evaluation but then later changed it after this event. Wheat vehemently disputes Johnson's interpretation of this incident and contends he never sexually propositioned her.

Shortly after these events, for reasons not entirely clear, Wheat left HIL. Johnson contends Wheat left because he was frustrated by the horrible evaluations students gave him. Wheat has not provided a response. In any event, HIL says that Johnson allegedly began circulating rumors that Wheat left because she filed a complaint against him with the Kentucky Commission on Human Rights ("KCHR"). Johnson says the KCHR told Johnson not to discuss her complaint and that she did not circulate rumors. Somehow, though, it appears that it was common knowledge among Johnson's classmates that Johnson

had taken some form of action against Wheat.

When HIL President Michael Hendricks learned about these rumors, he called Johnson to his office for a meeting. At that meeting Johnson told Wheat that she had filed charges against Wheat with the Kentucky Commission for Human Rights ("KCHR"), but refused to tell him what Wheat had allegedly done. Hendricks said KCHR had not contacted him and that he was concerned she was instead spreading rumors because Wheat failed her. Hendricks asked Johnson to bring him proof that she complained to KCHR or she would be subject to dismissal for dishonesty under HIL's Code of Conduct. Because she allegedly never provided such documentation, HIL held a Code of Conduct hearing and expelled Johnson for dishonesty.

Johnson's account is quite different. She claims that after Wheat failed her, she first called the police and said she was being sexually harassed. Johnson says she did not place the phone call because she received a failing grade, but because she knew she had to take another class with Wheat as a result of the failure and she wanted him to stop his derogatory behavior. The police put her in touch with the Rape and Crisis Information Center. She says the Center instructed her she was entitled to counseling, although she did not pursue it. The Center also told her she could contact the KCHR.

After receiving this advice, Johnson claims that she did in fact report Wheat to the KCHR before her initial meeting with Wheat and completed an official questionnaire detailing the events as they unfolded. She also voiced her concern, in the form of a phone call to the state's Board of Nursing. It is unclear what came of this action. The KCHR however, did respond to Johnson's complaint, ultimately determining that it lacked jurisdiction over schools. Officials at KCHR told her they would forward her complaint to the state's department of education.

Plaintiff says that when Hendricks called her in to discuss the rumor he was defensive and said Mr. Wheat was not violent, that Wheat would go after her financially, and that she had "better be sure" she was telling the truth in making her allegations. She further told Hendricks that KCHR told her not to discuss the details of her complaint with anyone and that she could not discuss it with him. In response, she says Hendricks requested proof that she had filed a complaint with KCHR and said he would expel her if it turned out she was lying. She says she tried to get this information immediately, but that the KCHR did not typically provide additional information on complaints, and was reluctant to do so in this case. As a result, she says, it took several weeks for her to get any proof.

In response to this request, some time before the Code of Conduct Board met, Johnson says she provided Hendricks with a letter from the Commission indicating that she attempted to file a charge against Wheat. This letter informed Hendricks that the Commission took the position that it did not have jurisdiction over the matter and thus could not have accepted a harassment charge against Wheat from Plaintiff. This letter did not say, however, as Hendricks subsequently told Johnson he really wanted, that Johnson filed the claim on a *specific date* before the initial August 21 meeting where Johnson told Hendricks she had filed charges. It is unclear whether Hendricks initially told Johnson if this letter was sufficient; she claims he gave her the impression that it was enough. Hendricks later told her, however, that the letter made no mention of sexual harassment and did not confirm she filed the

complaint prior to their meeting. It is unclear whether the Code of Conduct Board took this into consideration when it expelled her.[4]

## II.

In a series of decisions over the last 25 years, the Supreme Court has outlined the contours of Title IX liability. Beginning with its 1979 decision in *Cannon v. University of Chicago*, 441 U.S. 677, 704, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Court established that Title IX is enforceable through an implied private cause of action. In *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), the Court delineated the available remedies, holding that monetary damages are available for Title IX violations by a school district, but only in so far as the plaintiff proves intentional discrimination. Most recently, in *Gebser*, 524 U.S. 274, 118 S.Ct. 1989, the Court set forth the legal standards for institutional liability where a student ·alleges sexual harassment by a teacher. Rejecting assertions that an institution could be held vicariously liable for an employee's actions, the Court held that Title IX liability attaches only when a school official "who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has *actual knowledge* of discrimination" and fails to correct such behavior in a manner that amounts to *deliberate indifference. Id.* at 290, 118 S.Ct. 1989 (emphasis added).

■ Thus, to proceed on a Title IX claim against an educational institution a plaintiff must establish a prima facie case

by showing that: (1) she was subjected to *quid pro quo* sexual harassment or a sexually hostile environment; (2) she provided actual notice of the situation to an "appropriate person," who was, at a minimum, an official of the educational entity with authority to take corrective action and to end discrimination; and (3) the institution's response to the harassment amounted to "deliberate indifference." *Klemencic v. Ohio State Univ.*, 263 F.3d 504 (6th Cir. 2001); *see Morse v. Regents of the Univ. of Colorado*, 154 F.3d 1124, 1127–28 (10th Cir.1998) (citing *Gebser*, 524 U.S. at 289–90, 118 S.Ct. 1989). The Court addresses each of the *Gebser* elements separately.

### A.

Johnson alleges that Wheat's actions amounted to both a *quid pro quo* sexual proposition and subjected her to a sexually hostile environment. HIL vigorously disputes both of these claims.

#### 1.

■ To succeed on a *quid pro quo* claim, a plaintiff must allege that "a tangible employment [or educational] action resulted from a refusal to submit to a supervisor's sexual demands." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *see also Wills v. Brown Univ.*, 184 F.3d 20, 25 (1st Cir.1999) (defining *quid pro quo* harassment as occurring "when some benefit or adverse action, such as change in salary at work or a grade in school is made to depend on providing sexual favors to someone in authority...."). Courts considering *quid pro quo* claims have applied the same standard to Title IX and Title VII cases. *See Crandell v.*

4. Johnson also says she worked very hard to get what Hendricks wanted, but suggests the KCHR was not quick to respond to her requests and ultimately generated a form letter stating the status of her complaint. When she

again asked for a letter noting the proper date of her initial filing, Johnson says KCHR officials told her she was lucky to get anything since the KCHR typically did not provide any information on an individual request basis.

*New York College of Osteopathic Medicine,* 87 F.Supp.2d 304, 318 n. 145 (S.D.N.Y.2000); *Liu v. Striuli,* 36 F.Supp.2d 452, 465 (D.R.I.1999).

■ Johnson's allegations. sufficiently allege such a showing. She claims that on her last day of class, Wheat touched her at which point she told him that she was not interested. Despite previously giving her favorable reviews, Johnson alleges Wheat decided to fail her based on this encounter. Wheat counters that this conversation had nothing to do with his sexual interest in her and instead was entirely about her interest in the class and the lack of effort Johnson put forth. This is an entirely reasonable argument. However, it is also a matter of interpretation. Viewing the facts in a light most favorable to Johnson, a reasonable jury might also conclude that Wheat did fail her because she refused his alleged advances. Therefore, Johnson has sufficiently alleged *quid pro quo* harassment.

### 2.

■ HIL also contends Johnson's allegations are insufficient to constitute hostile environment harassment. Here the question is much closer. To establish a prima facie case for hostile environment under Title IX, Johnson must produce evidence that her educational experience was "permeated with discriminatory intimidation, ridicule and insult that [was] sufficiently severe or pervasive to alter the conditions" of her education and create a sexually hostile environment. *See Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *see also Faragher v. City of Boca Raton,* 524 U.S. 775, 787–89, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (discussing the standard applied in Title VII cases and noting that the behavior must unreasonably interfere with an employee's work performance).[5] To be actionable, the offensive behavior must be based on sex, rather than personal animus or other reasons. *Frazier v. Fairhaven Sch. Comm.,* 276 F.3d 52, 66 (1st Cir.2002). The conduct complained of is judged both objectively and subjectively; it must be sufficiently severe or pervasive to create an environment that a reasonable person would find hostile. *Black v. Zaring,* 104 F.3d 822 (6th Cir. 1997).

■ From the record, it is clear that plaintiff viewed her environment as hostile and abusive. The remaining question is whether a reasonable person in plaintiff's circumstances would find the educational environment so severe, pervasive, and objectively offensive as to undermine plaintiff's educational experience and deny her equal access to an institution's resources and opportunities. *See Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 650, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). In determining whether a plaintiff has established that an environment is hostile or abusive, a court must look specifically at (1) the conduct's severity; (2) the frequency of the abusive conduct; (3) whether it is physically threatening or humiliating rather than merely offensive; and (4) whether it unreasonably interferes with the plaintiff's performance. *See Harris,* 510 U.S. at 23, 114 S.Ct. 367. In applying these factors, the Supreme Court has stated that sporadic use of abusive language, gender related jokes, or occasional episodes of

---

**5.** Although there is no direct link between hostile environment claims under Title VII of the Civil Rights Act of 1964 and Title IX, courts rely on Title VII law to analyze Title IX hostile environment claims. *See, e.g., Frank-* *lin,* 503 U.S. at 73–76, 112 S.Ct. 1028 (stating that the same rule should apply when a teacher sexually harasses a student as applies when a supervisor sexually harasses a subordinate under Title VII).

harassment do not amount to discriminatory changes in the terms and conditions of employment. 524 U.S. at 788, 118 S.Ct. 2275.

■ Johnson's argument in this case is premised on four facts. First, Johnson says Wheat inappropriately touched her by sitting too close together on at least five occasions, including at lunch and on the elevator. Second, she says he often referred to sexual body parts with perverse slang. Third, she alleges that he talked openly in class about his genitalia. Fourth, Johnson claims on the last day of her clinical, he put his hands on her arms and shoulders before allegedly propositioning her. The Court has looked at a myriad of other cases addressing this same issue. The specific conduct here seems quite a bit less severe than other instances of sexually hostile educational claims. *See, e.g., Doe v. New Philadelphia Public Schools Bd. Of Educ.,* 996 F.Supp. 741 (N.D.Ohio 1998) (grade school teacher had sexual relationship with student that resulted in the teacher's pregnancy); *Massey v. Akron City Board of Education,* 82 F.Supp.2d 735 (N.D.Ohio 2000) (teacher/counselor fondled young boys, commented on their physique, phoned students at home, and engaged in sexual relations with at least one high school student); *Hayut v. State University of New York,* 127 F.Supp.2d 333 (N.D.N.Y.2000) (summary judgment denied where teacher repeatedly referred to student in class as "Monica Lewinsky" and asked her how "Bill" was doing); *Flores v. Saulpaugh,* 115 F.Supp.2d 319 (N.D.N.Y.2000) (summary judgment denied when teacher put

his arm around student, looked at her in a sexual manner, commented on her appearance, and stated that she should find a more mature boyfriend).

Rather, the harassment complained of here is more akin to those instances where courts granted summary judgment. *See, e.g., Gallant v. Board of Trustees of California State University,* 997 F.Supp. 1231 (N.D.Cal.1998) (professor's graphic comments about his sexual desire for another man and a greeting kiss on student's cheek does not rise to the level of severe or pervasive sexual harassment); *Klemencic v. Ohio State University,* 10 F.Supp.2d 911 (S.D.Ohio 1998) (coach did not create a sexually hostile environment by asking the student to go out with him and sending her a sexually suggestive magazine article because the acts were not severe or pervasive).[6] In sum, the absence of severe conduct directed at Johnson seems to set this case apart even from those that other courts have found insufficient.

Nevertheless, one might consider this a close question. It is always difficult to analyze conduct with which one thoroughly abhors in the light of statutory and judicial commands. However, analyzing several of the other *Davis* factors strongly support dismissing the claim here. Wheat's conduct was not "pervasive" in the sense that there was severe harassment on a regular basis. Nor can the comments Wheat made in class, although arguably entirely offensive, be classified as sufficiently humiliating and frequent to pass muster. Those comments are precisely the kind which the Supreme Court has said do not

---

**6.** The Supreme Court has noted, "whether gender-oriented conduct rises to the level of actionable harassment thus depends on a constellation of surrounding circumstances, expectations, and relationships, including, the ages of the harasser and the victim and the number of individuals involved." *Davis,* 526

U.S. at 629, 119 S.Ct. 1661. The Court notes that, while not determinative, the fact that Johnson was an older student in this case—thus making the age disparity between Wheat and herself quite different from that in the traditional teacher-student setting—is relevant to the Court's determination.

constitute discrimination. Last, it appears Johnson never stopped going to class. Title IX requires that the harassment clearly interfere with her education. In this case, although it is true Johnson and Wheat had a less than amicable relationship, it does not appear, based on the standard the law requires this court to apply, that his tendency to allegedly create a "sexually hostile environment" interfered with her education. The Court therefore concludes that Johnson has not sufficiently alleged that a hostile environment existed under Title IX. That part of her claim is dismissed.

## B.

■ As to the second requirement, the Supreme Court has held that, to establish a basis for institutional liability and recover damages, a Title IX litigant must demonstrate that "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the federal funding recipient's behalf" must have had actual knowledge of the facts underlying the Title IX claim. *Gebser*, 524 U.S. at 290, 118 S.Ct. 1989.[7] Neither constructive notice nor apparent authority will suffice.

The Court has not found any Sixth Circuit case interpreting the contours of the *Gebser* notice requirement. This case raises two important questions which *Gebser* left open. First, must the institution receive notice that Plaintiff herself was subjected to a sexually hostile environment or is notice from other individuals in this same environment sufficient? Lower courts have split on this question. It appears that all district courts addressing this issue have adopted the latter position, holding that "the institution must have

possessed enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based." *Folkes v. New York College of Osteopathic Med.*, 214 F.Supp.2d 273 (E.D.N.Y.2002); *see also Hart v. Paint Valley Local Sch. Dist.*, 2002 WL 31951264, *6–7, 2002 U.S. Dist. LEXIS 25720, *22 (S.D.Ohio 2002); *Frederick v. Simpson College*, 149 F.Supp.2d 826 (S.D.Iowa 2001); *Crandell v. New York College of Osteopathic Med.*, 87 F.Supp.2d 304 (S.D.N.Y.2000); *Gordon v. Ottumwa Comm. Sch. Dist.*, 115 F.Supp.2d 1077, 1082 (S.D.Iowa 2000); *Massey v. Akron City Bd. of Educ.*, 82 F.Supp.2d 735, 744 (N.D.Ohio 2000); *Doe v. School Admin. Dist. No. 19*, 66 F.Supp.2d 57, 63 (D.Me. 1999). On the other hand, the Fourth Circuit has interpreted *Gebser's* requirement of "actual knowledge of discrimination in the recipient's programs" to require "a showing that school district officials possessed actual knowledge of the discriminatory conduct in question." *Baynard v. Malone*, 268 F.3d 228, 237–38 (4th Cir. 2001). The Fourth Circuit concluded that, while a principal should have been aware of the potential for abuse based on reports from other students, the institution could not be held liable because there was no evidence indicating that the principal was actually aware that the student-plaintiff was being abused.

To decide which notice requirement governs, the Court returns to *Gebser*, where the Supreme Court concluded that, consistent with Congress's authority under the spending clause, institutional liability must be premised on "actual knowledge of discrimination in the recipient's programs." 524 U.S. at 290, 118 S.Ct. 1989. In this

---

7. No one in this case disputes that Hendricks, as HIL's President, was an official with the power to institute corrective measures.

Court's view, the *Gebser* notice standard does not require that the offending instructor actually commit previous acts of harassment against the plaintiff-student and that the plaintiff-student complain before the institution may be held liable for the instructor's subsequent repeated misconduct under Title IX. Actual knowledge of intentional discrimination and actual knowledge of the actual plaintiff's experiences are two different things; requiring the latter imposes a substantially higher test than the former. Consistent with the majority of other courts, the Court thus finds that the actual notice standard is met when an appropriate official has actual knowledge of a substantial risk of abuse to students based on prior complaints by other students.[8]

■ Here, though it is true Johnson herself never complained specifically about these instances, Hendricks was allegedly aware of four facts.[9] First, several students in their evaluations gave Wheat negative remarks and described him as "intimidating." Second, Johnson claims that Ronetta Potts, a Nurse Educator employed by Kosair, where Wheat taught the clinical, complained vociferously to Hendricks. At one point, Potts apparently faxed Hendricks a letter stating Wheat was inappropriate with patients and families; made inappropriate comments, such as questioning the morality of a patient for being a single unwed mother; and asked offensive questions and was condescending towards her. Third, Johnson claims that another student complained to Hendricks about Wheat's behavior and went so far as to compare Wheat to her abusive husband. Fourth, Johnson says that she went to Hendricks before her final clinical at Kosair and complained that Wheat was generally inappropriate in class. She further says she was afraid to tell him the details because she knew Hendricks and Wheat were friends and that Wheat was already acting threatening towards her. Johnson says she did not tell Hendricks about the touching.[10]

At this stage the Court cannot say for sure whether these comments and atti-

---

8. The Court further notes that this holding is consistent with the overriding purpose of *Gebser*: to limit institutional liability to cases where the institution, as a recipient of federal funds, has actual knowledge of discrimination and fails to respond. In such cases, the Supreme Court reasoned, liability was proper because the institution was violating its duty not to discriminate as part of its implicit contract with the federal government. *Gebser*, 524 U.S. at 286, 118 S.Ct. 1989. Consequently then, as soon as an educational institution can be said to be on notice that discrimination is occurring, a decision not to remedy the situation amounts to a violation of this contract, whether or not the notice stems from the plaintiff-student or from every other student in the classroom, except the plaintiff-student.

9. One additional problem with the notice requirement in this case is that, even if HIL had notice of all of these events, it is not clear that this notice preceded Johnson's alleged harassment.

10. At her deposition, Johnson testified that another student, Michele Slaughter told her that she complained to Hendricks after Wheat made the comment in class about the pain electrocution caused. According to Johnson, Slaughter claims she went to Wheat and said she hoped her complaining would not affect her grades. He allegedly told her, "Well, I'll plead amnesia this time, but don't let it happen again." The Court recognizes at this stage that this is clearly hearsay and has not considered it for the truth of the matter asserted. However the Court notes it, because it suggests Johnson was on notice that Wheat was tougher on students who complained and that this general knowledge might have deterred her from complaining further to Hendricks. This could be damaging evidence at trial, if admissible. Of course at trial, the Court presumes, Slaughter herself would testify about her own encounters with Wheat and Hendricks.

tudes were directed at women (and therefore are covered by Title IX) or were instead indicative of an across-the-board tough instructor. Indeed, the Court need not determine whether Hendricks had knowledge of conduct which might constitute discrimination against female students generally. That being said, with regard to the remaining *quid pro quo* claim, it appears Hendricks received absolutely no previous complaints of sexual advances or threats by Wheat against female students. This fact is critical to the remaining *quid pro quo* part of Johnson's sexual discrimination claim.

One could say, however, that the *Gebser* actual notice prong does not require such specificity: the relationship between the type of discrimination complained of, and the type of notice the school official receives need not perfectly correspond. The Court has found no other federal court opinion discussing this second issue left open by *Gebser*. The Court concludes, however, that the *Gebser* opinion requires a more stringent correlation. As the Supreme Court explained in *Gebser*, Congress enacted Title IX, pursuant to its spending clause power, "to avoid the use of federal resources to support discriminatory practices" and "to provide individual citizens effective protection against those practices." 524 U.S at 286, 118 S.Ct. 1989 (*citing Cannon*, 441 U.S. at 704, 99 S.Ct. 1946). In this respect, Title IX conditions "an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of

funds." *Id.* at 286, 118 S.Ct. 1989. Based on this underlying principle, the Court concluded that a recipient of federal funds could not be held liable for failing to prohibit sex discrimination, if it lacked notice that such discrimination took place and therefore lacked "an opportunity to take action to end the harassment or to limit further harassment." *Id.* at 289, 118 S.Ct. 1989.

Applying this contractual theory to this case, notice of a tendency to create a sexually offensive environment and notice of a tendency to sexually proposition a student are very different. HIL had knowledge of facts which may possibly have been sufficient notice of a sexually offensive atmosphere. However, under the Supreme Court's Title IX analysis, an institution's opportunity to respond and remedy a situation depends on its actual notice of the alleged discrimination; the scope of that notice, then, must also be a consideration in determining the institution's liability. HIL had no notice of the *quid quo pro* proposition. The Court, therefore, declines to find that the minimal notice HIL possessed is sufficient to create liability for Johnson's *quid pro quo* claim. As such, Johnson's *quid pro quo* claim must also be dismissed.

## III.

■ The Court next considers whether Title IX provides Johnson a cause of action and a private remedy against HIL for its allegedly retaliatory actions.[11] This ques-

---

11. As a preliminary matter the Court makes two determinations. First, courts are in agreement that there is no requirement that a plaintiff must prevail on any underlying claim of intentional discrimination in order to prevail on a claim of retaliation. *Peters v. Jenney*, 327 F.3d 307, 320–21 (4th Cir.2003) (discussing standard to apply in Title VI retaliation case where there no underlying claim remains); *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311–12 (11th Cir.2002) (discussing the standard to apply when there is no successful underlying claim in Title VII, ADA, and ADEA cases); *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir.2000) (noting in the prison inmate context, that the standard for judging whether a retaliation claim should proceed when the underlying claim is dismissed is whether that

tion requires the Court to explore whether the Supreme Court's jurisprudence creating a private right of action for intentionally discriminatory acts also permits claims premised on retaliation. This is an issue of first impression in the Sixth Circuit; other circuits have split on this question.[12] The Court therefore proceeds reviewing the relevant statutory and regulation provisions and then analyzing the effect of the Supreme Court's opinion in *Sandoval* on the availability of a cause of action for retaliation under Title IX.

### A.

When Congress enacted Title IX in 1972, it had two principal objectives in mind: "To avoid the use of federal resources to support discriminatory practices" and "to provide individual citizens effective protection against those practices." *Cannon,* 441 U.S. at 704, 99 S.Ct. 1946. Towards those ends, Title IX contains two distinct parts. First, § 901 provides that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of,

---

underlying claim was reasonable and not frivolous); *Borgo v. Goldin,* 204 F.3d 251 (D.C.Cir.2000) (analyzing Title VII retaliation case where underlying claims had been abandoned); *Vadie v. Mississippi State Univ.,* 218 F.3d 365, 374 n. 24 (5th Cir.2000). The standard in all of these cases was whether the plaintiff had a good faith, reasonable basis for believing the underlying claim existed. In this case, based on the nature of Wheat's comments in class as well as the fact that she apparently reasonably thought he failed her for not giving into his advances, the Court finds there was a subjective and objective basis for finding that she reasonably thought she was being harassed in violation of Title IX.

Second, this Court finds that Johnson has stated the prima facie elements for a retaliation claim. In *Morris v. Oldham County Fiscal Court,* 201 F.3d 784 (6th Cir.2000), the Sixth Circuit delineated the standard required to prove a claim for retaliation. Under that test, a plaintiff must prove that: (1) he engaged in protected activity; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *Id.* at 792. In this case, Plaintiff has established a prima facie case based on these elements. She engaged in a protected activity when she lodged a complaint with KCHR. Arguably, HIL took adverse action in expelling her when it learned of her actions. Although good arguments can certainly be made that HIL's actions were not pre-textual and were not based

on the fact that she complained to KCHR, but instead stemmed from the fact it thought she lied to the Code of Conduct Board, these are credibility questions for a jury to assess.

**12.** The Court characterizes this as a circuit split because the *Sandoval* decision arose different views as to how to consider retaliation claims promulgated under Title VI and Title IX. Since *Sandoval,* the two circuit courts addressing this point have adopted their different positions under different statutes. That is, the Fourth Circuit in *Peters v. Jenney,* 327 F.3d 307, held that a Plaintiff can sue for retaliation under Title VI (the statute analyzed in *Sandoval).* In contrast, the Eleventh Circuit has held that the same claim does not lie under Title IX. *Jackson v. Birmingham Board of Educ.,* 309 F.3d 1333 (11th Cir.2002). Because Title VI and Title IX are to be read and interpreted consistently, the Court finds no reason to consider these opinions as doing anything other than adopting conflicting holdings on the same question.

Moreover, the Eleventh Circuit's opinion in *Jackson* is also in direct conflict with *Frazier,* 276 F.3d at 67 (setting the standard a student must meet to prevail on a Title IX retaliation claim), although *Frazier* made no mention of *Sandoval,* as well as numerous circuit court decisions announced prior to *Sandoval* which uniformly found or implied that Title IX gives private plaintiffs a cause of action to redress retaliation. *See, e.g., Lowrey v. Texas A & M University System,* 117 F.3d 242 (5th Cir. 1997); *Brine v. Univ. of Iowa,* 90 F.3d 271, 272–73 (8th Cir.1996); *Murray v. N.Y. Univ. Coll. of Dentistry,* 57 F.3d 243, 251 (2nd Cir. 1995); *Preston v. Virginia ex rel. New River Cmty. Coll.,* 31 F.3d 203, 206 (4th Cir.1994).

or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a).[13] Section 901, then, can be said to create the right.

Second, in section § 902, Congress created an elaborate administrative enforcement scheme for Title IX. Pursuant to § 902, any federal department or agency

that "is empowered to extend Federal financial assistance to any education program or activity" is "authorized and directed to effectuate the provisions of" § 901. To do so, agencies are required to "issue rules, regulations, or orders of general applicability," which do not "become effective unless and until approved by the President." [14] In this way, Section 902 provides

13. In relevant part, § 901, 86 Stat. 373, as amended, as set forth in 20 U.S.C. § 1681, provides:

(a) Prohibition against discrimination; exceptions

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . .

(b) Preferential or disparate treatment because of imbalance in participation or receipt of Federal benefits; statistical evidence of imbalance

Nothing contained in subsection (a) of this section shall be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or percentage of persons of that sex in any community, State, section, or other area: Provided, That this subsection shall not be construed to prevent the consideration in any hearing or proceeding under this chapter of statistical evidence tending to show that such an imbalance exists with respect to the participation in, or receipt of the benefits of, any such program or activity by the members of one sex.

(c) "Educational institution" defined

For purposes of this chapter an educational institution means any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education, except that in the case of an educational institution composed of more than one

school, college, or department which are administratively separate units, such term means each such school, college, or department.

20 U.S.C. § 1681(a).

14. Section 902, 86 Stat. 374, as set forth in 20 U.S.C. § 1682, titled "Federal administrative enforcement; report to Congressional committees," provides in relevant part:

Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity . . . is authorized and directed to effectuate the provisions of section 1681 of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability . . . . No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement . . . , or (2) by any other means authorized by law: Provided, however, That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the

administrative agencies with powers to add greater specificity to the § 901 right.

Under this § 902 authority, the Department of Education promulgated a regulation, 34 C.F.R., Part 100, which provides:

> (e) Intimidatory or retaliatory acts prohibited. No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act *or this part,* or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this part.

34 C.F.R. § 100.7(e) (emphasis added).[15]

Importantly, the Department of Education's Title IX regulations, which establish rights under "this part" for purposes of 34 C.F.R. § 100.7(e), forbid *both* intentional discrimination *and* practices that have a disparate impact, but are not intentionally discriminatory. 34 C.F.R. § 100.3. The regulations further require "affirmative action to overcome the effects of prior discrimination," 34 C.F.R. § 100.3(b)(6)(I), and permit affirmative action "even in the absence of such prior discrimination," 34 C.F.R. § 100.3(b)(6)(ii). Based on this scheme, Johnson alleges Congress has permitted her to sue HIL for retaliatory actions taken in violation of Title IX.

## B.

The Court begins its analysis by considering the Supreme Court's recent opinion in *Sandoval,* 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517. In that case, the Court clarified and articulated the approach courts must now follow in determining whether to imply a private right of action from a statute and, in so doing, analyzed a regulation promulgated under Title VI.[16] The Supreme Court's analysis of the relationship between §§ 601 and 602 of Title VI in *Sandoval* largely informs this Court's analysis of §§ 901 and 902 of Title IX. *Cannon,* 441 U.S. at 694–99, 99 S.Ct. 1946 (noting that Title IX "was patterned after Title VI" therefore finding based on the statutory language of Title VI should logically extend to Title IX as well).

In *Sandoval,* the Supreme Court considered whether a private individual could bring an action for violations of regulations forbidding disparate impact practices. The Court began by stating three principles which framed its analysis. First, private individuals may sue to enforce §§ 601 and 901 to obtain both injunctive relief and monetary damages. *See Sandoval,* 532

---

grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report. 20 U.S.C. § 1682(b).

**15.** 34 C.F.R. § 100.7(e) was originally promulgated by the Department of Justice to enforce Title VI of the Civil Rights Act of 1964 ("Title VI"), 78 Stat. 252, as amended, 42 U.S.C. § 2000d *et seq.* The Department of Education has incorporated by reference § 100.7(e) and other regulations enforcing Title VI to enforce Title IX. *See* 34 C.F.R. § 106.71; *see also Jackson,* 309 F.3d at 1338 n. 4 (11th Cir.2002).

**16.** 532 U.S. at 286, 121 S.Ct. 1511 (noting that *Sandoval* is the culmination of the

Court's gradual shift from the four factor analysis stated in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975)—which looked at (1) whether plaintiff was a member of a protected class; (2) legislative intent; (3) the underlying purpose of the legislative scheme; and (4) whether the cause of action was traditionally delegated to state law—to a framework that looks only at the second factor, statutory intent); *see also Thompson v. Thompson,* 484 U.S. 174, 189, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988) (Scalia, J. concurring) (noting that the Court has "converted one of [the] four factors (congressional intent) into the determinative factor, with the other three merely indicative of its presence or absence.").

U.S. at 279–80, 121 S.Ct. 1511 (*citing Cannon*, 441 U.S. at 694–99, 99 S.Ct. 1946 (holding that a private right of action exists to enforce Title IX)); *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 72, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (holding that both monetary and equitable remedies are available under a Title IX action). Second, " § 601 prohibits only intentional discrimination." *Sandoval*, 532 U.S. at 280–82, 121 S.Ct. 1511. Third, some "regulations promulgated under § 602 of Title VI may validly proscribe activities that have a disparate impact on racial groups, even though such activities are permissible under § 601." *Id.* at 281, 121 S.Ct. 1511.

The Court then turned to classify the regulation at issue: a Department of Justice regulation promulgated pursuant to § 602 of Title VI that forbade recipients of federal funding from "utilizing criteria or methods of administration which have the effect of subjecting individual to discrimination because of their race, color, or national origin." 29 C.F.R. § 42.104(b)(2)(1999). Recognizing that Title VI itself only reached acts of intentional discrimination, the plaintiff in *Sandoval* did not allege a violation of Title VI *per se*. Instead, the plaintiff claimed the Alabama Department of Public Safety's policy of administering all tests for drivers' licenses in English had a uniquely discriminating effect on minorities. This disparate impact, the plaintiff argued, violated the Justice Department's regulation. In effect, the plaintiff wanted the Court to find that, implicit in the grant of § 602 authority to federal agencies to enact regulations was a private right to sue under § 602 for violations of those regulations. The Court refused to imply such a private right of action into § 602's language.

To reach this conclusion, the Court distinguished between two types of regulations an agency might enact under its § 602 authority. On one side were those regulations that applied § 601's ban on intentional discrimination. *Sandoval*, 532 U.S. at 284, 121 S.Ct. 1511. In those cases, the Court explained:

> We do not doubt that regulations applying § 601's ban on intentional discrimination are covered by the cause of action to enforce that section. Such regulations, if valid and reasonable, authoritatively construe the statute itself, *see NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 257, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995); *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and it is therefore meaningless to talk about a separate cause of action to enforce the regulations apart from the statute. A Congress that intends the statute to be enforced through a private cause of action intends the authoritative interpretation of the statute to be so enforced as well.

*Id.*

Consequently, the Court reasoned, a regulation tied to effectuating § 601's ban on intentional discrimination simply further policed the type of discrimination that § 601 already prohibited. Therefore, in such cases, to allege a violation of a regulation enacted under § 602's authority, was not to sue under an independent cause of action for a violation of a particular regulation or even § 602, but rather was to sue for a violation of a right created by § 601. The regulation (enacted under § 602's authority), the Court reasoned, simply further explained what that § 601 right entailed. In these cases, the Court concluded that it was unnecessary to consider whether an implied private right of action existed because the plaintiff was

simply exercising his already existing right to sue under § 601.

In the second category were those regulations enacted under § 602 authority that went farther and "[forbade] conduct that § 601 permits." *Sandoval,* 532 U.S. at 285, 121 S.Ct. 1511. In other words, the Court distinguished those regulations—like the one in *Sandoval* involving a disparate impact rule—where the plaintiff alleged a violation of a regulation which prohibited discrimination without regard to intent. In those instances, the Court stated that the plaintiff's claim for a violation of the regulation was not covered by the § 601 ban on *intentional* discrimination; instead, the Court characterized the plaintiff's claim as a separate cause of action seeking relief under § 602. Because the plaintiff's claim in *Sandoval* was premised on a regulation that involved a disparate impact rule, as opposed to a claim of intentional discrimination, the Court placed it in this second category. Thus, the question presented in *Sandoval,* and the one the Court primarily addressed, was whether § 602 conferred a separate private right of action.[17] The

Supreme Court held that § 602 conferred no such private right of action. *Id.*[18]

### C.

■ Based on the *Sandoval* framework, this Court must make two related determinations. First, the Court must analyze whether a claim based on the Department of Education's anti-retaliation regulation effectuates § 901's anti-discrimination mandate. Second, applying *Chevron,* the Court must find the regulation is valid and commands deference. *See Sandoval,* 532 U.S. at 284, 121 S.Ct. 1511 (noting that regulations applying § 601's ban on intentional discrimination, if valid and reasonable under *Chevron,* authoritatively construe the statute itself and are covered by the § 601 right of action). If the regulation passes both of these tests, Johnson's claim premised on § 100.7(e), is encompassed by the well-established private right of action under Title IX for intentional discrimination.

### 1.

As to the first question, HIL argues that this Court should adopt the Eleventh Circuit's reasoning in *Jackson v. Birmingham*

---

17. The Court stated:

It is clear now that the disparate-impact regulations do not simply apply § 601—since they indeed forbid conduct that § 601 permits—and therefore clear that the private right of action to enforce § 601 does not include a private right to enforce these regulations. *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 173, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (a "private plaintiff may not bring a [suit based on a regulation] against a defendant for acts not prohibited by the text of [the statute]"). That right must come, if at all, from the independent force of § 602. As stated earlier, we assume for purposes of this decision that § 602 confers the authority to promulgate disparate-impact regulations; the question remains whether it confers a private right of

action to enforce them. If not, we must conclude that a failure to comply with regulations promulgated under § 602 that is not also a failure to comply with § 601 is not actionable.

*Sandoval,* 532 U.S. at 285, 121 S.Ct. 1511.

18. To answer this question, the Court examined § 902's text for "rights-creating language" that would exhibit Congress's intent to confer a private right of action for violations of all regulations promulgated thereunder. *Id.* at 291, 121 S.Ct. 1511. Applying its revised statutory intent test, the Court concluded that the language of § 902 exhibited no such intent: "Neither as originally enacted nor as later amended does Title VI display an intent to create a freestanding private right of action to enforce regulations promulgated under § 602." *Id.* at 293, 121 S.Ct. 1511.

*Board of Educ.*, 309 F.3d 1333, 1344–48 (11th Cir.2002), where a court considering the same question presented here held that "[n]othing in the text [of § 901] indicates any congressional concern with retaliation that might be visited on those who complain of Title IX violations. Indeed, the statute makes no mention of retaliation at all." *Id.* at 1344. Drawing from *Sandoval's* instruction that courts should not imply private rights of actions where Congress does not explicitly designate them, the Eleventh Circuit reasoned that § 901's anti-discrimination mandate did not encompass claims for retaliation. *Id.* at 1345–46. *See also ·Atkinson v. Lafayette College*, 2002 WL 123449, 2002 U.S. Dist. LEXIS 1432 (E.D.Pa.2002) (relying on *Sandoval* to find that the court lacked the power to imply a private right of action for retaliation under Title IX); *Litman v. George Mason University*, 156 F.Supp.2d 579 (E.D.Va.2001) (same).

This Court respectfully disagrees and adopts the position more recently set forth by the Fourth Circuit in *Peters v. Jenney*, 327 F.3d 307 (4th Cir.2003) (addressing the same issue in the Title VI context). *See also Frazier*, 276 F.3d at 67 (establishing the standard a student must meet to prevail on a Title IX retaliation claim, but not discussing the effect of *Sandoval* on the court's analysis); *Burwell v. Pekin Comm. High Sch. Dist. 303*, 213 F.Supp.2d 917, 934–25 (C.D.Ill.2002) (recognizing claim for retaliation under Title IX). In *Peters*, the Fourth Circuit reasoned that the text of *Sandoval* and Title IX did not require the court to analyze § 601's text to determine whether Congress, as evidenced wholly by statutory intent, explicitly created an implied private right of action. 327 F.3d at 316–17. This was because *Peters*, like this Court, first analyzed whether § 100.7(e) "applied § 601's ban on intentional discrimination..." *Id.* Drawing on the *Peters* approach, this Court, for several reasons,

concludes that the anti-retaliation provision cuts to the core of § 901's ban on intentional discrimination and is covered by that section's existing cause of action.

First, as a doctrinal matter, a regulation that specifically prohibits retaliation for intentional discrimination does not prohibit any more action than § 901 already prohibits. That is, if the *Sandoval* Court refused to allow the claim in that case to proceed because it concluded the DOJ regulation forbade conduct that § 601 permitted, then the test here is whether § 100.7(e) prohibits conduct otherwise allowed by § 901. 532 U.S. at 285, 121 S.Ct. 1511 (concluding that it "is clear now that the disparate-impact regulations do not simply apply § 601—since they indeed forbid conduct that § 601 permits—and therefore clear that the private right of action to enforce § 601 does not include a private right to enforce these regulations"). The Court concludes, based on this test, that in so long as § 100.7(e) is used to challenge acts of *intentional* discrimination—and therefore only prohibits conduct already prohibited by § 901—the regulation· is properly within the existing implied private right of action to enforce § 901 and does not attempt to forbid conduct § 901 otherwise permits. In as much as an intent to discriminate exists when someone is intentionally treated differently because of her gender, that intent clearly carries over to a context where someone intentionally chooses to expel a student based on actions she took in defense of her rights as a member of a particular gender. The purpose in both cases is the same: to punish someone for reasons that, but for intentional discrimination against their gender, would not exist.

Second, the Supreme Court has implicitly recognized that the right to be free from retaliation is implicit in the right to be free from intentional discrimination. To begin,

in *Sullivan v. Little Hunting Park*, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969), the Supreme Court considered whether 42 U.S.C. § 1982's broad prohibition on discrimination on property transactions also allowed a claim for retaliation. Nothing in the text of § 1982 mentioned retaliation. The plaintiff alleged his neighborhood association retaliated against him because he attempted to lease his property to a black man. The plaintiff brought suit under § 1982,[19] which the board challenged, claiming the plaintiff's expulsion was not covered by § 1982's anti-discrimination provision. Rejecting this assertion, the Supreme Court held that "if that sanction, backed by a state court judgment, can be imposed, then Sullivan is punished for trying to vindicate the rights of minorities protected by § 1982. Such a sanction would give impetus to the perpetuation of racial restrictions on property." As several federal courts have noted, *Sullivan* can thus be construed to stand for the proposition that a prohibition on discrimination should be judicially construed to include an implicit prohibition on retaliation against those who oppose the prohibited discrimination. *Peters*, 327 F.3d at 317; *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 576 (6th Cir.2000); *Fair Employment Council v. BMC Mktg. Corp.*, 28 F.3d 1268, 1280 (D.C.Cir.1994).

Four years after *Sullivan*, the Court used the same logic and similarly recognized that, while 42 U.S.C. § 1983 nowhere expressly bars retaliation,[20] retaliation must be actionable in order to effectuate those rights. *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). The Court held that even though a state employee has no right to employment, the state could not simply fire him for criticizing his employer. *Id.* at 597, 92 S.Ct. 2694. "This would allow the government to produce a result which [it] could not command directly." *Id.* (*citing Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958)). *See also Crawford–El v. Britton*, 523 U.S. 574, 588 n. 10, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) (explaining that "retaliation offends the Constitution [because] it threatens to inhibit exercise of the protected right" and "is thus akin to an unconstitutional condition demanded for the receipt of a government-provided benefit"). Importantly, both *Sullivan* and *Perry* involved anti-discrimination statutes written at the same level of generality as Title IX.

Relying on the Supreme Court's statement of this principle in these two contexts, numerous federal courts of appeals, including the Sixth Circuit, have similarly held that 42 U.S.C. § 1981, which broadly prohibits discrimination in contracting, also provides a cause of action for retaliation. *See, e.g., Foley v. Univ. of Houston Sys.*, 324 F.3d 310, 315 (5th Cir.2003); *Murrell v. Ocean Mecca Motel, Inc.*, 262 F.3d 253, 258 (4th Cir.2001); *Johnson*, 215 F.3d at 576; *Andrews v. Lakeshore Rehab. Hosp.*, 140 F.3d 1405, 1411–13 (11th Cir. 1998); *Phelps v. Wichita Eagle–Beacon*, 886 F.2d 1262, 1266–67 (10th Cir.1989); *Fiedler v. Marumsco Christian Sch.*, 631 F.2d 1144, 1149 n. 7 (1980). Each of these opinions reached this conclusion, despite the fact § 1981—like §§ 1982 and 1983— says nothing about retaliation and "only proscribes purposeful discrimination." *Pe-*

---

**19.** Section 1982 provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

**20.** Section 1983 provides a cause of action for individuals who have been deprived, "under color" of law, of any of the "rights, privileges, or immunities secured by the Constitution and laws."

*ters,* 327 F.3d at 318 (*citing Murrell,* 262 F.3d at 257).[21]

Last, this Court notes that, on several prior occasions, the Supreme Court has stated that Congress intended to prohibit a wide range of discriminatory actions when it enacted Title IX. In *North Haven Board of Educ. v. Bell,* 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982), the Court stated, "[t]here is no doubt that if we are to give [Title IX] the scope that its origins dictate, we must accord it a sweep as broad as its language." *Id.* at 521, 102 S.Ct. 1912 (*citing United States v. Price,* 383 U.S. 787, 801, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966)). The Court thus concluded that Title IX authorized the Department of Health, Education and Welfare to enact a regulation prohibiting gender discrimination in employment by federal fund recipients, even though employment itself was not mentioned in § 901. *See also Franklin,* 503 U.S. at 76, 112 S.Ct. 1028 (interpreting Title IX broadly to find that Title IX reaches student-on-student sexual harassment). Likewise, the Supreme Court has held that all available remedies are available to effectuate Title IX's guarantees. *Franklin,* 503 U.S. at 69, 112 S.Ct. 1028 ("the existence of a statutory right implies the existence of all necessary and appropriate remedies"). In this case, to find that Johnson had a right to be free from intentional discrimination but receives no protection when she faces retaliation for asserting that right contradicts these decisions. In such a circumstance, it only makes practical sense that under Title IX one has the right to sue a defendant who

prevents one from asserting her Title IX rights.

**2.**

Finding that § 100.7(e) falls squarely within § 901's ban on intentional discrimination, the Court must last determine whether § 100.7(e) is valid under *Chevron* and therefore commands this Court's deference.

Under the *Chevron* standard, a court inquires "first whether the intent of Congress is clear as to the precise question at issue ... If so, that is the end of the matter." *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 257, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995). If, however:

> the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. If the administrator's reading fills a gap or defines a term in a way that is reasonable in light of the legislature's revealed design, we give the administrator's judgment controlling weight.

*Id.* (internal quotation marks and citations omitted).

In this case, the Department of Education is the agency historically "charged with responsibility for administering Title IX." *Cannon,* 441 U.S. at 706–08, 99 S.Ct. 1946. Pursuant to this authority, the Department of Education promulgated § 100.7(e). Here, because Congress clearly did not explicitly authorize the Department of Education to enact a regulation prohibiting retaliation, Congress's intent is not clear. The question therefore is whether the Department of Education could reasonably construe § 901 to authorize § 100.7(e).

---

**21.** Section 1981 provides, in relevant part, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."

This Court concludes, in light of the principles and the long line of authority previously discussed, that the Department of Education can certainly be said to have acted reasonably in construing § 901 to forbid retaliation premised upon opposition to practices § 901 makes unlawful. *Peters*, 327 F.3d at 318. It "is neither inconsistent with the text of [§ 901] nor an unreasonable construction of that section for an agency to construe it to cover those who are purposefully injured for opposing the intentional discrimination Congress made unlawful via [§ 901]." *Id.* Accordingly, the Court finds that the Department of Education acted reasonably in enacting § 100.7(e) and its regulation is entitled to deference and must be given controlling weight under *Chevron*.

The Court will enter an order consistent with this Memorandum Opinion.